IN THE
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

PHILIP M.,
    Plaintiff,

v.

COMMISSIONER OF SOCIAL
SECURITY,
    Defendant.

Case No. 4:19-cv-04027-SLD-JEH

### Report and Recommendation

Now before the Court is the Plaintiff's Motion for Summary Judgment (Doc. 12) and the Defendant's Motion for Summary Affirmance (Doc. 16). This matter has been referred for a report and recommendation. The Motions are fully briefed, and for the reasons stated herein, the Court recommends the Plaintiff's Motion for Summary Judgment be denied and the Defendant's Motion for Summary Affirmance be granted.[1]

### I

Philip M. filed a Title II application for disability insurance benefits (DIB) on October 21, 2015 and a Title XVI application for supplemental security income (SSI) on May 6, 2016. He alleged disability beginning on June 17, 2015. His claims were denied initially on December 22, 2015 and upon reconsideration on May 25, 2016. Philip filed a request for hearing concerning his DIB and SSI applications which was held via video before the Honorable Robert V. Luetkenhaus (ALJ) on July 13, 2017. At that hearing, Philip was represented by a non-attorney

---

[1] References to the pages within the Administrative Record will be identified by AR [page number]. The Administrative Record appears at (Doc. 7) on the docket.

1

representative, and Philip, his niece Anneke, and a vocational expert (VE) testified. Following the hearing, Philip's DIB and SSI claims were denied on November 17, 2017. His request for review by the Appeals Council was denied on December 6, 2018, making the ALJ's Decision the final decision of the Commissioner. Philip filed the instant civil action seeking review of the ALJ's Decision on February 8, 2019.

## II

At the hearing, Philip was 59 years old and lived with his sister in a house. He claimed the following conditions limited his ability to work: back injury; shoulder pain; Type 2 Diabetes; and neuropathy. AR 315.

Philip testified about his previous employment, and he specifically testified about the weight he lifted in those jobs, his duties, and the extent to which he was on his feet performing them. He said that he could no longer do the job he had in 2014 at Howe Overhead Doors "because of my back and there was a lot of heavy lifting . . . I couldn't really do like climb or – and a whole lot of things that needed to be done on the job and I wasn't able to do all that." AR 56. He further testified that if he overdid it at that job, he would pay for it the next day such that he could not move. He stopped working at Howe after he had an accident on the job caused by his back when he lost his balance and fell off a ladder. He injured his shoulder when he fell. Philip did not attempt to return to work at all since December 2015. He testified that it was his goal in life to have a job, but his back condition was "unbearable . . . sometimes." AR 68.

In response to the ALJ's question as to what kept Philip from working eight hours a day, five days a week, Philip answered:

> Well, one thing that I do . . . my back is really out – out of whack I tell you. I can't lift very much, I can't stoop, I can't kneel down. I can't do a lot of those things because of the situation of my back. Then I also hurt my shoulder that was really – that's really in a bad condition also.

> Then I have this sciatic nerve I tell you that makes me so nauseated when it comes and makes me so sick to my stomach. And I'm always trying to lay down in the bed, you know, to be comfortable. And I can't sleep at nights at times because of my back situations and my sciatic nerve.

AR 75. He additionally mentioned his Type II diabetes, neuropathy, and drop foot caused him issues. Philip detailed his lower back symptoms included numbness, aches, pain, and stiffness in his low back and legs. The symptoms were located in the lower left of his back to between his buttocks, and sometimes the pain went down his left leg to his foot if his sciatic nerve was "trigger[ed] off." AR 80. As for Philip's right shoulder injury, his doctor told him he needed a shoulder replacement. Philip explained that he first went to therapy for it which "kind of improved [it] a little bit," but he knew he would have to go through with the surgery in the future. AR 81. The right shoulder injury caused Philip pain which traveled down his neck to the top of his shoulder. Philip confirmed his left shoulder was fine. Philip could reach above his head, but it caused pain to the right side of his right shoulder. Upon observing Philip move his arms from the sides of his body and out in front, the ALJ confirmed Philip was able to reach out in front of his body. Philip further testified that he laid down in bed all day two times a week due to back pain. On days he did not lay down all day, Philip elevated his legs, and if he did not do that, he became stiff.

  Philip testified he could walk and stand, if on concrete, for ten minutes at most. He thought he could sit for about 20 minutes or more in an office chair before he would have to stand up. He thought he could lift no more than 15 pounds. If necessary, he could go to the store and pick up a few items, but otherwise, he could not stand and walk around stores for too long. He could no longer mow the lawn because it jarred his back. He said he did not do a lot of the housekeeping, he did

his laundry once every two weeks and received assistance with it, and he did the dishes if he was having a good day.

After Philip's niece Anneke testified, the VE was questioned. The ALJ presented the VE with the following hypothetical individual:

> An individual 57 to 59 years of age who has completed 12 grades of education and has the same past relevant work as [Philip]. This individual retains the ability to do light work but let me clarify that by saying that the individual can lift and carry up to 25 pounds occasionally and 20 pounds frequently, and the individual can stand and walk up to six hours out of an eight hour work day. In addition this individual can reach only frequently overhead and laterally.

AR 109. The VE testified such an individual could do Philip's previous work as a cashier. The ALJ then revised the hypothetical as follows:

> This individual retains the ability to do light work but this individual can only occasionally reach overhead but frequently in all other directions with the bilateral upper extremities. Handling, fingering, and feeling are unlimited but the individual can only occasionally climb ramps and stairs, can never climb ladders, ropes, or scaffolds, but can occasionally balance, stoop, kneel, crouch, and crawl. And in addition this individual must avoid all unprotected heights and moving mechanical parts, and must avoid all vibration.

AR 110. The VE testified that the individual could still work as a cashier. The VE additionally testified that that Philip acquired skills that would be transferable such that there were sedentary cashier jobs available, and the VE testified that two 15-minute breaks in addition to the customary ones would not be tolerated by an employer.

### III

In his Decision, the ALJ found Philip had the following severe impairments: lumbar radiculopathy; degenerative osteoarthritis changes of the right shoulder;

diabetes mellitus; and neuropathy. AR 29. The ALJ made the following residual functional capacity (RFC) finding:

> [T]he claimant has the [RFC] to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he can occasionally reach overhead and frequently in all other directions with the bilateral upper extremities. Handling, fingering and feeling are unlimited. He can occasionally climb ramps and stairs, never climb ladders, ropes or scaffolds, and occasionally balance, stoop, kneel, crouch and crawl. He must avoid all unprotected heights, vibration, and moving mechanical parts.

AR 30.

The ALJ discussed Philip's medical records beginning with a June 2015 record at which time he presented to his primary care provider Valerie Flacco, M.D. At that time, he reported he fell at work and hurt his right side. Dr. Flacco referred Philip to the pain clinic. The ALJ discussed Philip's pain clinic records. At those visits, Philip was noted to be in moderate distress due to pain and had tenderness to palpation of the lumbar spine with decreased range of motion, but he had normal gait and no difficulty toe and heel walking, he had 5/5 strength in all muscle groups other than the abductors and flexors of the right arm which was 3/5, he had normal muscle tone and bulk in all extremities except the right shoulder and arm which was slightly atrophic, and he had intact sensation and symmetric reflexes. In addition to his pain clinic visits and follow up with his primary care Dr. Flacco, Philip received, among other things, Norco, injections in his back and shoulder, physical therapy, and Gabapentin.

Philip's July 2015 MRI of his lumbar spine showed degenerative changes at L5-S1 disc space with bilateral foraminal narrowing and facet arthrosis and a disc protrusion was seen. Those findings were not significantly changed since Philip's previous February 2013 MRI. In December 2015, an examination of Philip's right shoulder showed he had painful range of motion but no loss of movement and

had full cervical motion. He complained in January 2016 of right shoulder pain due to falling off a ladder the previous year and had been going to pain management for the shoulder. An x-ray showed significant arthritis of the AC joint and glenhumeral joint. The doctor explained Philip may need humeral resurfacing but was first referred for EMG studies. An EMG of Philip's right upper extremity was done in January 2016 and showed no evidence of compression neuropathy, peripheral neuropathy, or radiculopathy. The doctor referred Philip to physical therapy before he would do surgery. Philip reported physical therapy helped as he had less tingling and numbness and had full stable range of motion of the shoulder, though he was still in pain. A February 2016 EMG of his lower spine showed mild sensory motor polyneuropathy and S1 radiculopathy greater on the left than right. He was referred to psychology for an evaluation for a spinal cord stimulator.

In October 2016, Philip was admonished at his pain clinic visit regarding his failure to respond to pill count calls. In December 2016, Philip reported to Dr. Flacco that he was going to get a nerve stimulator, but he was fired from the pain clinic for not coming in for his pill count/drug screen. In April 2017, Philip told Dr. Flacco that he was trying to get into the pain clinic. In June 2017, Philip was treated in the ER with a Toradol injection for low back pain that radiated into his legs.

During his December 2015 Adult Medicine Consultative Examination by Deborah O'Brien, M.D., Philip told Dr. O'Brien he could sit and stand for short periods, could drive, and could feed, bathe, and dress himself. Philip was able to get on and off the examination table with no difficulty, he could walk greater than 50 feet without support, he was able to perform toe and heel walking but not squatting, he had 5/5 grip strength in both hands, and he had normal ability to grasp and manipulate objects. His deep tendon reflexes were present, equal, and

symmetrical. He had limited range of motion of the shoulders and cervical spine, but his lumbar spine range of motion was not limited. Dr. O'Brien had the following impression of problems: low back pain; right shoulder pain, osteoarthritis; diabetes with neuropathy; hypertension; and hyperlipidemia.

> The ALJ ultimately summarized:
>
> [T]he medical record does not document ongoing, disabling pain that the claimant alleges as the claimant's physical examinations and imaging studies have not found significant deficits, his treatment has been routine and conservative, and records show it was effective in managing his pain. The claimant has presented objective medical findings that he has mild to moderate impairments, but has not presented evidence that they are of a degree he would be unable to perform and sustain full-time work within the [RFC]. Given his subjective complaints of pain and difficulty reaching and lifting, but also considering his nearly normal objective motor exam, the record supports the ability to work at the light activity level . . . .

AR 35-36. Finally, the ALJ addressed Philip's representative's objection to Dr. O'Brien on the basis that she "had it out" for Philip from the start and that no weight should be afforded her assessment. The ALJ pointed out that Philip presented no evidence of any bias on Dr. O'Brien's part other than Philip's own subjective allegations. The ALJ also noted Dr. O'Brien's examination did not differ substantially from Philip's own treating records as his pain clinic doctor also performed physical examinations that also documented a normal gait and normal strength other than strength of the right upper extremity.

## IV

Philip argues: 1) the ALJ erred in the RFC assessment and failed to adequately question the VE regarding Philip's inability to squat and stoop; 2) the Decision should be reversed because the ALJ's credibility assessment is patently wrong; and 3) the ALJ erred by failing to build a logical bridge between the evidence to his conclusion Philip is not disabled pursuant to the Grid Rules.

The Court's function on review is not to try the case de novo or to supplant the ALJ's findings with the Court's own assessment of the evidence. *See Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000); *Pugh v. Bowen*, 870 F.2d 1271 (7th Cir. 1989). Indeed, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Although great deference is afforded to the determination made by the ALJ, the Court does not "merely rubber stamp the ALJ's decision." *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). The Court's function is to determine whether the ALJ's findings were supported by substantial evidence and whether the proper legal standards were applied. *Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986). Substantial evidence is defined as such relevant evidence as a reasonable mind might accept as adequate to support the decision. *Richardson v. Perales*, 402 U.S. 389, 390 (1971), *Henderson v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999).

In order to qualify for disability insurance benefits, an individual must show that his inability to work is medical in nature and that he is totally disabled. Economic conditions, personal factors, financial considerations, and attitudes of the employer are irrelevant in determining whether a plaintiff is eligible for disability. *See* 20 C.F.R. § 404.1566; § 20 C.F.R. 416.966.[2] The establishment of disability under the Act is a two-step process.

First, the plaintiff must be suffering from a medically determinable physical or mental impairment, or combination of impairments, which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Second, there must be a factual determination that the impairment renders the plaintiff unable to engage in any substantial gainful employment. *McNeil v. Califano*, 614 F.2d 142, 143 (7th

---

[2] The standards for establishing a disability in order to receive DIB and SSI are materially the same. *Compare* 20 C.F.R. § 404.1501 *et seq.* (DIB) *with* 20 C.F.R. § 416.901 *et seq.* (SSI). Thus, the Court may at times only cite to the DIB regulations.

Cir. 1980). The factual determination is made by using a five-step test. *See* 20 C.F.R. § 404.1520. In the following order, the ALJ must evaluate whether the claimant:

1) currently performs or, during the relevant time period, did perform any substantial gainful activity;

2) suffers from an impairment that is severe or whether a combination of her impairments is severe;

3) suffers from an impairment which meets or equals any impairment listed in the appendix and which meets the duration requirement;

4) is unable to perform her past relevant work which includes an assessment of the claimant's residual functional capacity; and

5) is unable to perform any other work existing in significant numbers in the national economy.

*Id.* An affirmative answer at any step leads either to the next step of the test, or at steps 3 and 5, to a finding that the plaintiff is disabled. A negative answer at any point, other than at step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled. *Garfield v. Schweiker*, 732 F.2d 605 (7th Cir. 1984).

The plaintiff has the burdens of production and persuasion on steps 1 through 4. However, once the plaintiff shows an inability to perform past work, the burden shifts to the Commissioner to show ability to engage in some other type of substantial gainful employment. *Tom v. Heckler*, 779 F.2d 1250 (7th Cir. 1985); *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984).

In the instant case, Philip claims error on the ALJ's part at step four.

### A

Philip first argues the ALJ erred by failing to confront the evidence showing Philip is unable to squat pursuant to his consultative examination. Philip contends that the inability to squat would reasonably yield an inability to stoop such that

9

the ALJ committed legal error by failing to incorporate in the RFC and failing to question the VE regarding the impact his inability to squat and stoop would have on employment. The Commissioner argues that the medical record did not support a finding that Philip would be unable to perform all work, and the ALJ's conclusion draws support from the opinion evidence as well. Specifically, with regard to the consultative examination, the Commissioner argues the ALJ's determination is actually supported by (not undermined by) the consultative examiner's opinion. The Commissioner further argues that the ALJ properly outlined all of Philip's limitations in his hypothetical question to the VE.

    An RFC assessment "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8p; *see also Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001) ("In assessing the claimant's RFC, the ALJ must consider both the medical and nonmedical evidence in the record"). Here, the ALJ discussed Philip's testimony that the latter could not work because his back was bad, he could not stoop, and his back condition caused numbness and stiffness. The ALJ also discussed Philip's December 2015 consultative examination during which Philip was not able to squat, though his range of motion of the hips, knees, and ankles was not limited, nor was the range of motion of his lumbar spine. Later in the Decision, the ALJ explained that the record did "not demonstrate clearly that [Philip] has the significantly limited range of motion, muscle spasms, muscle atrophy, motor weakness, sensation loss, difficulty ambulating, or reflex abnormalities which are associated with intense and disabling pain." AR 34. He further explained that Philip's "claims of extremely limited functional capacity are not demonstrated by the medical records." *Id*. In support of those findings, the ALJ pointed to the medical evidence of: his ability to get on and off the exam table with no difficulty; the ability to walk without

assistive devices; the ability to perform toe walking and heel walking; 5/5 grip strength in both hands; normal ability to grasp and manipulate objects; normal range of motion of the elbows, wrists, hips, knees, ankles, cervical spine, and lumbar spine; 5/5 strength in all extremities other than the right upper extremity; symmetric reflexes; and intact sensation. *Id*. The ALJ explicitly acknowledged that Philip had, at times, pain to palpation of the lumbar spine with decreased range of motion, but that such findings "do not support the claimant's allegation that he is disabled from all work activity, given his other functional abilities noted above." AR 35. Nevertheless, as the ALJ explained, he incorporated such "slight limitations" into the RFC which limited Philip to, among other things, only occasional postural activities. *Id*.

The foregoing was the very narrative discussion required of ALJs to provide in their decisions. It is apparent from that narrative discussion that the ALJ did not include the inability to squat or stoop in the RFC, or otherwise further confront such evidence, because the ALJ determined such a postural limitation was not supported by the record evidence. It was not legal error for the ALJ to exclude that postural limitation merely because Philip stated it was so, as the ALJ properly considered Philip's subjective statements (for the reasons set forth *infra*). It was also not legal error for the ALJ to exclude that postural limitation merely because Philip was unable to squat at the consultative examination, as the ALJ clearly articulated that the record evidence as a whole did not support the significant deficits Philip alleged. Significantly, as the Commissioner points out, the consultative examiner stated that Philip was able to do all tasks. The ALJ built the necessary logical bridge between the evidence and his conclusions including, among others, Philip remained capable of occasional stooping. *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) ("an ALJ need not mention every piece of evidence, so long he builds a logical bridge from the evidence to his conclusion").

11

The record evidence to which the ALJ cited was substantial evidence to support that conclusion. *See Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (explaining "whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency [in the administrative law context] is not high"). Because the ALJ did not commit legal error in his formulation of the RFC, the ALJ did not commit legal error by failing to question the VE regarding the impact Philip's alleged inability to squat and stoop would have on employment. Both the hypothetical questions posed to the VE and the ALJ's RFC assessment must incorporate only those limitations supported by the medical record. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015).

**B**

Next, Philip argues the ALJ's credibility assessment was erroneous for the following reasons: the ALJ drew a negative credibility inference without acknowledging record evidence that supported his statements as to symptoms; the ALJ determined the significance of particular medical findings himself; and the ALJ should have addressed why Philip's doctors found it was appropriate to continue prescribing multiple pain medications before drawing a conclusion that Philip's statements as to his symptoms were not consistent with the evidence.

SSR 16-3p directs the ALJ to focus on the "intensity and persistence of the applicant's symptoms." *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016). SSR 16-3p provides that all the evidence, including objective medical evidence, is to be considered in evaluating the intensity, persistence, and limiting effects of an individual's symptoms and also the factors set forth in 20 C.F.R. § 404.1529(c)(3) are to be considered including: the claimant's daily activities; the location, duration, frequency, and intensity of pain or other symptoms; precipitating and aggravating factors; medications and their side effects; non-medication treatments; any other measures used to relieve pain or other symptoms; and any

other factors concerning the claimant's functional limitations and restrictions due to pain and other symptoms. SSR 16-3p, at *7-8.

Philip's challenge to the ALJ's subjective symptom evaluation amounts to grasping at straws. First, the ALJ simply included in his summary of the medical records that treating Dr. Flacco in June 2015 referred Philip to a pain clinic as she "[did] not want to rx anymore for narcotics." AR 31 (citing AR 470). Notably, as the Commissioner points out, the ALJ did not tie Dr. Flacco's clinical record to his evaluation of Philip's subjective statements. There is no indication *anywhere* in the ALJ's Decision that he drew a negative credibility inference from Dr. Flacco's note where the ALJ proceeded to also discuss Philip's pain medication use and his receipt of injections to treat his pain. The ALJ juxtaposed Philip's pain complaints and description of his symptoms with record evidence that, among other things, his treatment was "essentially routine and conservative in nature," he failed to follow all treatment modalities which led to him being fired from the pain clinic, and he was reluctant to pursue surgery on his right shoulder. AR 35.

Second, the ALJ merely stated a fact of record – during the timeframe the ALJ considered, no surgery had been discussed or recommended for his lumbar spine. While it was the ALJ, not a doctor of record, who stated no such surgery was discussed or recommended "given the mild findings in his imaging studies," Philip does not persuasively argue how that single statement amounted to harmful legal error. The fact that Philip previously underwent lumbar surgery in 2004 (several years before the period the ALJ considered) does not undermine the ALJ's stated reasons[3] for rejecting Philip's statements as to the intensity and limiting effects of his lumbar back impairment.

---

[3] As previously discussed, the ALJ pointed out Philip's treatment was essentially routine and conservative. The ALJ also pointed out:

Third, the ALJ did not commit reversible error simply because he did not delve further into Philip's prescription narcotic medication use. It is clear the ALJ considered that Philip did, in fact, experience back and shoulder pain for which, "to his credit, [he] presented regularly to a pain clinic for treatment[.]" AR 35. It is also clear, however, that the ALJ determined Philip's pain was not as limiting as he alleged where his own failure to comply with all treatment modalities caused him to be fired from the pain clinic, he did not show signs associated with intense and disabling pain, and he retained certain physical abilities (e.g., 5/5 strength in all extremities other than the right upper extremity, the ability to walk without an assistive device). The ALJ gave specific reasons for why he did not find Philip's pain was as intense or limiting as he alleged, and those reasons are supported by the record. *Curvin v. Colvin*, 778 F.3d 645, 651 (7th Cir. 2015). The Court finds the ALJ's subjective symptom evaluation was not patently wrong. *Id*.

C

Lastly, Philip argues that he simply cannot perform the postural requirements of light work and he should have been assessed with a sedentary RFC which, in turn, would have required the ALJ to find him disabled any time after his 55th birthday on January 14, 2013 pursuant to the Medical Vocational Framework (Grid rules). Philip's final argument is a repeat of the first argument in his brief that the ALJ erred in the RFC assessment and failed to adequately question the VE. He just couches it differently the second time around - "the ALJ erred by failing to build a logical bridge between the evidence to his conclusion Philip is not disabled pursuant to the Grid Rules"). *See* Plf's MSJ (Doc. 13 at pgs.

---

> [Philip] was recommended at one time for a trial spinal cord stimulator, but he was fired from the pain clinic for not coming in for a pill count drug screen[]; the claimant's failure to follow all treatment modalities is inconsistent with the severity of symptoms that he alleges.

AR 35.

8-11, 12-14). Because the Court has already rejected Philip's argument as to the ALJ's assessment of Philip's RFC, the Court need not revisit the issue for purposes of determining whether the ALJ properly applied the Grid rules. Because the ALJ's RFC assessment is free of legal error and supported by substantial evidence, the ALJ was not required to assess the case differently under the Grid rules.

V

For the reasons set forth above, it is recommended that: 1) the Plaintiff's Motion for Summary Judgment (Doc. 12) be denied; 2) the Defendant's Motion for Summary Affirmance (Doc. 16) be granted; 3) The Clerk of Court be directed to enter judgment as follows: "IT IS ORDERED AND ADJUDGED that the decision of the Defendant, Andrew Saul, Commissioner of Social Security, denying benefits to the Plaintiff, Philip M., is AFFIRMED."; and 4) this matter be terminated.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk within fourteen (14) days after service of this Report and Recommendation. FED. R. CIV. P. 72(b)(2); 28 U.S.C. § 636(b)(1). Failure to object will constitute a waiver of objections on appeal. *Johnson v. Zema Systems Corp.*, 170 F.3d 734, 739 (7th Cir. 1999); *Lorentzen v. Anderson Pest Control*, 64 F.3d 327, 330 (7th Cir. 1995).

*It is so recommended.*

Entered on July 13, 2020.

s/Jonathan E. Hawley
U.S. MAGISTRATE JUDGE